IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
| v. | ) | No. 17 CR 603 |
|  | ) |  |
| TYRONE JOHNSON | ) | Judge Virginia M. Kendall |
|  | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## MEMORANDUM OPINION AND ORDER

On September 13, 2017, Defendant Tyrone Johnson was charged with being a felon in possession of a firearm in violation of 18 U.S.C. 922(g)(1). (Dkt. 1.) Johnson moved to suppress firearms seized from his car following an encounter with Chicago Police Officers that resulted in his arrest, as well as statements Johnson made to the police officers during the encounter and after his arrest. (Dkt. 36.) On January 31 and February 4, 2019, the Court held an evidentiary hearing to resolve factual disputes as to whether the officers had reasonable suspicion to stop Johnson. The Court also invited the parties to file post-hearing position papers.[1] After the hearing, the

---

[1] Post-hearing position papers were due on February 18, 2019 and any responses were due by February 25, 2019. (Dkt. 54.) Johnson' counsel filed his position paper on March 12, 2019 and filed an affidavit in support three days later, without seeking an extension of time or otherwise acknowledging that his filings were nearly a month late. Though the Court would be within its discretion to refuse to accept Johnson's untimely submission, *see, e.g.*, *United States v. Suggs*, 703 F. App'x 425, 428 (7th Cir. 2017), it will consider the filings in this instance. If Johnson's counsel is unable to meet the Court's deadlines in the future, he must seek an extension of time and indicate whether the extension is objected to, whether it is the first extension sought, and the reasons for the request, per the Court's standing order on Motion Practice.

1

Defendant filed an affidavit contradicting the testimony of the officers at the hearing. For the following reasons, Johnson's Motion to Suppress [36] is denied.

## Background

Chicago Police Officers Brian Murphy and Scott Liedtke testified during the January 31, 2019 suppression hearing. On November 20, 2016, Officer Murphy and Officer Liedtke were on patrol in an unmarked police car when, at approximately 9:00 p.m., they spotted a silver car being driven by an individual they later identified as Johnson. (1/31/19 Hearing Tr. at 10:12-11:2; 17:1-10; 26:8-16; 56:9-21; 57:8-58:10.) Earlier that day, the officers received a report that shots had been fired from a silver car. (*Id.* at 11:3-17; 58:14-59:4.) Because of that report, and because they observed Johnson's car moving at a high rate of speed, the officers decided to follow Johnson's car. (*Id.* at 11:3-17; 35:13-19; 58:14-59:4; 71:15-18.) The officers observed that Johnson was alone in the car and did not have any passengers. (*Id.* at 51:15-52:19; 61:12-15.) They followed Johnson for a few minutes, eventually turning onto North Leamington Avenue, a one-way street going south. (*Id.* at 11:15-13:9, 14:16-15:7; 59:1-21.) After the officers followed Johnson onto N. Leamington, heading south, they saw him pull his car over to the west side of the street directly next to a fire hydrant and stop. (*Id.* at 14:6-15:18; 59:1-60:20.) The fire hydrant was on the passenger side of Johnson's car. (*Id.*) The officers did not turn on the lights or sirens in their car to pull Johnson over, angle their car to force him to stop, or otherwise command him to stop the car. (*Id.* at 13:15-25; 17:21-18:1; 61:19-62:6.) The officers were approximately a half-block behind Johnson's car when Johnson pulled over. (*Id.* at 14:1-4.)

After the officers saw Johnson pull his car next to the fire hydrant, they pulled their own patrol car alongside Johnson's. (*Id.* at 16:5-6; 60:25-61:5.) The officers' car was on the left (*i.e.*, driver's side) of Johnson's, and there were several feet between the two cars. (*Id.* at 16:7-16; 61:3-5.) There was enough space between the officers' car and Johnson's car for Johnson to exit from his driver's-side door. (*Id.*) There was a car parked directly in front of Johnson's, but there were no cars parked behind him. (*Id.* at 15:19-23; 48:15-49:7; 60:13-24.) The curb and the fire hydrant were directly to the right (*i.e.*, passenger's side) of Johnson's car. (*Id.* at 60:18-22.) When the officers pulled up to Johnson's car, they did not see anyone else in his car. (*Id.* at 16:21-25.)

After the officers pulled their car next to Johnson's, Officer Murphy asked Johnson if he was aware that he was parked on a fire hydrant and if he had a driver's license. (*Id.* at 17:12-18; 60:10-19.) Johnson told the officers he did not have a driver's license. (*Id.* at 17:19-20; 62:20-21.) Johnson's car's engine was running throughout the interaction and the officers never asked him to turn it off. (*Id.* at 17:21-18:1.) The officers then began to exit their car, at which point Johnson quickly drove his car in reverse, northbound on N. Leamington, and fled the scene. (*Id.* at 18:2-11, 62:22-63:1.) Because there were no cars parked behind him, Johnson did not have any difficulty reversing his car away from the officers. (*Id.* at 20:22-21:4.)

After a pursuit, the officers stopped Johnson's car and arrested him. (*Id.* at 21:6-14.) While he was being arrested, Johnson told the officers that he had a gun in his car. (*Id.* at 21:15-19; 63:10-13.) Law enforcement searched Johnson's car and discovered two loaded firearms. (*Id.* at 21:20-22:4; 63:14-25.) One was found on the

passenger-side floorboard and the other was found between the center console and the seat. (*Id.*)

Johnson did not testify at the suppression hearing, but he later filed a sworn affidavit in support of his motion to suppress. (Dkt. 59.) In his affidavit, Johnson presents a different version of events. According to Johnson, there was a passenger in his car with him. (*Id.* at ¶ 1.) Johnson states that he pulled over on N. Leamington to drop the passenger off and that the passenger exited his car and walked into a residential building. (*Id.* at ¶ 2.) Johnson states that he stopped in front of the fire hydrant because there were other cars parked in the legal parking spaces next to the building. (*Id.*) Johnson states that when he pulled next to the fire hydrant, there was a car directly in front of his, and a car parked "about four feet" behind his. (*Id.* at ¶ 3.) According to Johnson, he was thus "blocked in" when the officers pulled up next to him and he could not "drive forward or leave in a regular manner." (*Id.* at ¶ 3-4.) Johnson states that he pulled out of the space in reverse "using the small amount of space" between his car and the car behind him. (*Id.* at ¶ 4.) Johnson states that after the police officers pulled up next to him, the driver of the police car asked him what he was doing, and he responded that he was waiting for his passenger to return. (*Id.*)

## **Discussion**

Johnson argues that the officers subjected him to an investigatory stop, because he could not leave in an ordinary manner, and that the officers did not have the reasonable suspicion required for an investigatory stop. The government argues that the encounter was consensual, and so Johnson's Fourth Amendment rights were never triggered, but that even if they were, the officers had reasonable suspicion that Johnson violated the Chicago Municipal Code by parking in front of a fire hydrant.

First, there is not a disputed issue of fact for the Court to resolve because the Defendant failed to allow the Court to judge the credibility of his testimony at the hearing. He did not testify. Instead, he waited until the entire hearing was completed and he had the benefit of the two officers' statements under oath and then he filed his affidavit to put the factual dispute into play. Although the affidavit is signed, it holds little weight with the court for three reasons. Initially, the facts at the hearing show that the Defendant fled in reverse down the street to escape from the officers. This is inconsistent with the affidavit which states that Defendant could not break the encounter with the officers who had blocked him in at the curb because a car was parked directly in front of him and four feet behind him. The officers testified that there were no cars parked behind him, which is how he was able to place the car in reverse and flee. Their testimony is credited over the affidavit because common sense dictates the challenge of turning a vehicle out of a blocked parking space with four feet of clearance to escape. Next, neither officer observed another person in the car, yet the affidavit claims that he was merely waiting for someone to return. That person never appeared on the scene, nor does it make sense that if he were truly

5

merely waiting for someone to return that he would need to flee backwards down the street. Finally, due to the untimely filing of the affidavit and the lack of the Court's ability to judge the Defendant's credibility in comparison to the credibility of the two officers who testified without impeachment, the Court must credit their testimony.

Here, it is necessary to break down the interaction between the officers and the defendant into sequences. The first sequence is the interaction that occurred when the officers pulled up alongside the defendant's car and asked him if he knew he was parked by a fire hydrant and asked for his driver's license. The second sequence is when the defendant told the officers that he did not have a driver's license and then fled the scene.

The Fourth Amendment's prohibition on unreasonable searches and seizures extends to "brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Terry v. Ohio*, 392 U.S. 1, 17 (1968). A "consensual encounter between an officer and a private citizen," however, "does not trigger the Fourth Amendment." *United States v. Clements*, 522 F.3d 790, 794 (7th Cir. 2008.) An interaction between an officer and an individual is transformed from a consensual encounter into a seizure implicating the Fourth Amendment when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen" such that "a reasonable person would [not] feel free to terminate the encounter." *United States v. Hendricks*, 319 F.3d 993, 999-1000 (7th Cir. 2003) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

6

In this case, the evidence presented at the suppression hearing establishes that the interaction between Johnson and the officers was consensual. A reasonable person would feel free to terminate an encounter, like this one, in which "officers approach a citizen sitting in a parked car and ask a few questions, as long as the officers do not flash their weapons, use physical force, use forceful language suggesting that compliance with the officer's request might be compelled, or prevent the citizen from driving away." *United States v. Brissey*, 520 F. App'x 481, 483 (7th Cir. 2013) (citing cases). Here, the officers testified that they did not turn on the lights or sirens in their car to pull Johnson over, angle their car to force him to stop, or otherwise command him to stop the car. (Hearing Tr. at 13:15-25; 17:21-18:1; 61:19-62:6.) There is no evidence in the record that the officers flashed their weapons,[2] used physical force, or used forceful language "suggesting that compliance with [their] request[s] might be compelled," and the officers clearly did not prevent Johnson from driving away, because he did exactly that. (*Id.* at 18:2-11, 62:22-63:1); *Brissey*, 520 F. App'x at 483; *see also United States v. Douglass*, 467 F.3d 621, 624 (7th Cir. 2006).

Johnson argues that the encounter amounts to an investigatory stop because the officers' car "block[ed] him in," which prevented him from "leaving in an ordinary manner." (Dkt. 58 at 6.) Johnson cites no cases to support his argument that the analysis turns on whether he could leave "in an ordinary manner." Even if he had,

---

[2] Mr. Johnson's affidavit states that at least one of the officers exited the patrol car with a gun drawn, *see* Dkt. 49 at ¶ 4, but the officers' testimony at the suppression hearing did not include any mention that either officer drew their service weapon while exiting the car. As explained further below, the Court did not have the opportunity to observe Johnson's testimony at the hearing and assess his credibility, because his testimony came in the form of the affidavit after the fact. Where Johnson's affidavit testimony conflicts with the officers' hearing testimony, the Court finds Johnson's affidavit testimony not to be credible.

7

the record does not support his contention that he was unable to do so. The Court "had the opportunity to listen to testimony and observe the demeanor of witnesses at the suppression hearing," and the Court must weigh the officers' hearing testimony against Johnson's affidavit. *United States v. Thurman*, 889 F.3d 356, 366 (7th Cir. 2018). The officers testified that there was enough space between their car and Johnson's to allow Johnson to exit from the driver's-side door, and that there was not a car parked behind him. (Hearing Tr. at 15:19-23; 16:7-16; 60:13-24; 61:3-5.) The Court finds the officers' testimony to be credible and persuasive. Indeed, given that Johnson "*did* in fact flee from the scene and lead the officers on a chase," the Court concludes that a reasonable person would have felt free to leave. *See Douglass*, 467 F.3d at 624. Because the initial encounter between Johnson and the officers was consensual, Johnson's Fourth Amendment rights were not implicated.

The government argues that, even if the initial encounter was not consensual, the officers had reasonable suspicion to stop Johnson once they saw him stop his car in front of the fire hydrant on N. Leamington. The officers' hearing testimony establishes that Johnson stopped his car on N. Leamington directly next to a fire hydrant. (Hearing Tr. at 14:6-15:18; 59:1-60:20.) Parking within 15 feet of a fire hydrant violates Chicago Municipal Code section 9-64-100(a). According to the government, because the officers believed Johnson was violating the Chicago Municipal Code by parking next to a fire hydrant, they had reasonable suspicion sufficient to believe he was violating the law, and that is enough to support an investigatory stop. *See United States v. Shields*, 789 F.3d 733, 745 (7th Cir. 2015) (holding that a suspected parking

8

violation under the Chicago Municipal Code provides sufficient reasonable suspicion for an investigatory stop).

Johnson argues in his post-hearing position paper that he was not violating the law, because he was not "parked" within 15 feet of the fire hydrant as that term is defined in the Chicago Municipal Code. *See* Dkt. 58 at 7-9. The Chicago Municipal Code defines "parking" as "the standing of an *unoccupied* vehicle otherwise than temporarily for the purpose of and while actually engaged in loading or unloading property or passengers." Chi. Mun. Code § 9-4-010 (emphasis added). "Standing" is defined in the Code as "the halting of a vehicle, whether occupied or not, otherwise than temporarily for the purpose of and while actually engaged in receiving or discharging passengers, provided, that, an operator is either in the vehicle or the immediate vicinity . . . ." *Id.*

As Johnson correctly points out, the officers' hearing testimony establishes that the officers never observed his car to be unoccupied, and so they did not observe him to be "parked" next to the fire hydrant in violation of the Chicago Municipal Code. *See* Dkt. 58 at 8; Hearing Tr. at 17:21-18:1. The officers saw Johnson's vehicle standing—they did not see it parked. And standing in front of a fire hydrant, as Johnson was, does not violate the Chicago Municipal Code. *See* Chi. Mun. Code § 9-64-100. An officer still has reasonable suspicion to justify a stop even if the officer makes a mistake of law, but only if the mistake is reasonable. *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014). This mistake was not reasonable. This is not a situation like the one in *Heien:*

9

> There, an officer pulled the plaintiff over because one of his brake lights was out. *Heien*, 135 S.Ct. at 532. The plaintiff was released when a state court later held that the relevant statutory provision only required a single working brake light. *Id.* The police officer in Heien [] was wrong on the law, but not unreasonably so. The language of the relevant provision was ambiguous. *Id.* at 540. And, because of the ambiguity, the officer's mistake—believing that all brake lights must be functioning instead of just one—was reasonable. *Id.*

*Guinto v. Nestorowicz*, 14 C 9940, 2015 WL 3421456, at *3 (N.D. Ill. May 28, 2015). But the "parking-versus-standing ordinance" at issue here "is unambiguous—a car that is occupied by definition is not 'parked.'" *Id.* (citing Chicago Municipal Code and finding that officer's mistake of law was not reasonable where the officer arrested an individual for parking in a no-parking zone when the individual was in his car the entire time, because "an occupied car is not parked"); *see also United States v. Stanbridge*, 813 F.3d 1032, 1037 (7th Cir. 2016) ("*Heien* does not support the proposition that a police officer acts in an objectively reasonable manner by misinterpreting an *unambiguous* statute") (emphasis in original).

Ultimately, however, it is irrelevant that the officers lacked reasonable suspicion for an investigatory stop. The evidence presented at the hearing demonstrates that the officers' initial encounter with Johnson was consensual and did not rise to the level of an investigatory stop. And it is beyond dispute that the officers had probable cause to arrest Johnson once he told them he did not have a driver's license and then fled the scene. *See Shields*, 789 F.3d at 745 (citing *Devenpeck v. Alford*, 543 U.S. 146 (2004)). The subsequent search of Johnson's car that uncovered the guns was a permissible search incident to that arrest. *See, e.g.*, *United States v. Paige*, 870 F.3d 693, 702 (7th Cir. 2017) (citing *Arizona v. Gant*, 556 U.S. 332, 338 (2009).

## **Conclusion**

For the reasons stated above, Johnson's motion to suppress [36] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: March 25, 2019